# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Leon and Ruth Pfaff, individually, and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| SYNGENTA CORPORATION; SYNGENTA CROP PROTECTION, LLC; and SYNGENTA SEEDS, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Leon and Ruth Pfaff ("Plaintiffs"), through their undersigned attorneys, brings this action individually and on behalf of all others similarly situated against Defendants Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Seeds, Inc., (collectively "Defendants" or "Syngenta") and allege as follows:

## NATURE OF THE CASE

1.    This class action is brought by Plaintiffs challenging the conduct of Syngenta, which has caused significant damage and financial loss to Plaintiffs and the Class of similarly situated farmers throughout the United States. Syngenta's contamination of the U.S. corn supply has made it unfit for export to China, a major trade partner and importer of corn, thereby depressing the price of corn in the United States.

2.    Corn production is of crucial economic importance to the United States. The U.S. is ranked first in the world in total corn production and exports a significant amount of its production.

3.      The U.S. corn marketing system is commodity-based, meaning the corn grown by farmers such as Plaintiffs and those in the Class is harvested, gathered, commingled, consolidated, and otherwise shipped from thousands of farms from which it is cultivated, harvested and passed through local, regional, and terminal distribution centers. From there, it is often transported by exporters to foreign countries. In order to maintain the stability of the corn marketing system and its integrity, it is essential that the U.S. corn supply and U.S. corn exports maintain the highest standards of purity and integrity and be free from contaminating features that can cause export shipments to be rejected by trade partners.

4.      Syngenta is a major agribusiness company, and Syngenta Seeds, Inc.'s principal place of business in Minnetonka, Minnesota.   Among other things, Syngenta is involved in the commercial seed business, developing, producing, and selling, through dealers and distributors or directly to growers, a wide range of agricultural products throughout the United States, including corn seed with certain genetically modified traits. After development, Syngenta then licenses corn seed with multiple genetically enhanced features, called "trait stacks," to seed manufacturers, including Syngenta subsidiaries.

5.      This case challenges Syngenta's conduct with regard to MIR162, utilized in the Agrisure Viptera ™ and Agrisure Duracade™ trait stacks. Over seventy (70) varieties of corn utilize the MIR162 trait to produce a protein that results in insect resistance. These corn varieties are commonly referred to as Viptera corn and Duracade corn, representing the particular traits the corn will express. MIR162 was intended to control insect damage; however Syngenta's actions caused the contamination of the entire U.S. corn supply.

MIR162 is prohibited from export to countries such as China, where it has not been approved for purchase or consumption. Syngenta knew this, yet still marketed and sold Viptera, which contained MIR162. Such conduct was reckless, deceptive, and unlawful. This conduct caused financial loss to the Class, by amongst other things, causing a depression in corn prices.

6.      Beginning in 2010, Syngenta released, prematurely, a genetically modified corn trait known as MIR162, sold under the Agrisure Viptera ™ ("Viptera") trademark, into the U.S. market.

7.      Agrisure Duracade™ is Syngenta's second generation of MIR162 corn and was released, sold, and distributed for planting in 2014.

8.      A substantial amount of the total U.S. corn crop, including Minnesota's corn production, is exported.  In fact, over half of the corn grown in the United States is exported throughout the world market. U.S. exports of corn amount to billions of dollars annually. China is a major destination of U.S. corn exports, whose importance, until the trade disruption outlined herein, was projected to grow significantly over the next ten years. According to the United States Department of Agriculture, China purchased an estimated 5,000,000 tons of U.S. corn in 2012/13, up from 47,000 tons in 2008, making China the third largest export market for U.S. corn. China was on track to meet or exceed these numbers in 2013/14.

9.      As of November 2013, China has stopped importing U.S. corn when it detects traces of MIR162 in U.S. corn shipments. Moreover, China has given no indication of when, or if, it will approve Syngenta's genetically engineered seed.

10.     MIR162 corn was only planted on about 3% of U.S. acres for the last two seasons. While only a very small percentage of U.S. farmers plant MIR162 corn, the level of MIR162 corn planted is too high to ensure that any shipment of U.S. corn will not be contaminated with trace amounts of MIR162 after corn has been commingled and consolidated for export. Thus, as a result of China's prohibition on the importation of MIR162 corn, even in trace, low-level amounts, and Syngenta's decision to continue marketing MIR162 to a small minority of U.S. corn farmers the vast majority of U.S. corn has been effectively excluded from what was previously the third-largest export market for U.S. corn, causing U.S. farmers significant damages as corn prices have dropped from the loss of China's export markets.

11.     Syngenta's decision to bring Viptera to the market crippled the 2013 and 2014 corn export market to China and caused damage to Plaintiff and other Class members. Syngenta knew, or should have known, that releasing Viptera would lead to the contamination of U.S. corn shipments and prevent U.S. corn from being sold to export markets such as China, which had not granted regulatory approval to MIR162. Following this widespread harm, Syngenta's decision to release Duracade – its second generation MIR162 corn hybrid – again illustrates that Syngenta has acted in reckless disregard of the consequences of inflicting widespread harm to the U.S. corn market.

12.     Due to Syngenta's conduct described herein Plaintiff and those similarly situated in the Class have incurred losses, damage, and injury arising from the rejection of U.S. grown corn by export markets. Plaintiff and the members of the Class have been damaged, at least, by: (1) Syngenta's premature release of Viptera corn into the U.S. corn

and corn seed supply which has reduced and/or prevented the export of U.S. corn to China and caused a depression of corn prices; (2) Syngenta's subsequent release of Duracade corn into the U.S. corn and corn seed supply which, again, has effectively foreclosed U.S. exports of corn to China; (3) Syngenta's materially misleading failure to disclose material facts that MIR162 was not approved in China; (4) Syngenta's premature release of Viptera  and Duracade corn into the U.S. corn and corn seed supply resulting in the commingling of MIR162-corn with Plaintiff and the Class's non-MIR162 corn at grain elevators, terminals, rail cars, barges, and ships; and, (5) upon information and belief, Syngenta's widespread contamination of the U.S. corn and corn seed supply with MIR162 which will continue to result in the reduction of the U.S. corn export market to China (and prices) in the future. But for the conduct of Syngenta complained of herein, these losses would not have occurred by the Class.

## PARTIES

### A.    Plaintiffs

13.    Plaintiffs Leon and Ruth Pfaff (the "Pfaffs" or "Plaintiffs") are residents of Holmen, Wisconsin and are engaged in the business of planting, growing, harvesting and selling corn. The Pfaffs do not buy MIR 162 seed from Syngenta. Instead, the Pfaffs only buy corn seed that has either not been genetically modified, or corn seed genetically modified with traits that have been approved by all major corn importing countries, including China. At all times relevant to this action, the Pfaffs have been engaged in farming in the State of Wisconsin. Plaintiffs' income results from the ultimate sale of corn grown on its farmland and on land it leases from others.

14.     Plaintiffs have been damaged by: (1) Syngenta's release of Viptera corn into the U.S. corn and corn seed supply, which has destroyed the export of U.S. corn to China and caused depressed prices for all domestic corn; (2) Syngenta's materially misleading statements relating to the approval status of MIR162 in China and the impact the lack of approval would have on the market; and (3) Syngenta's widespread contamination of the U.S. corn and corn seed supply with MIR162, which will continue to foreclose the U.S. export market to China in future years and will continue to lead to lower corn prices per bushel in the U.S. market, as a result.

**B.     Defendants**

15.     Defendant Syngenta Corporation is a Delaware corporation with a principal place of business at 3411 Silverside Road #100, Wilmington, Delaware 19810.

16.     Defendant Syngenta Crop Protection, LLC, is a limited liability company organized and operating under the laws of the State of Delaware with its principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409.

17.     Defendant Syngenta Seeds, Inc. is a Delaware corporation with its principal place of business at 11055 Wayzata Boulevard, Minnetonka, Minnesota 55305.

18.     Upon information and belief the acts of the named Defendants herein were conducted in concert pursuant to an agreement amongst themselves to act in this collective manner.  All are therefore, jointly and severally liable for the acts complained of herein.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. §§1331 and 1332, 15 U.S.C. § 1125(a) (Lanham Act), and

supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). The amount in controversy exceeds $5,000,000.00.

20.     This Court has personal jurisdiction over the Defendants because Defendants regularly and systematically conduct business in this District, including, the marketing and sale of Viptera and Duracade corn within this District. Defendant Syngenta Seeds, Inc., whose activities and conduct are central to this dispute, is headquartered and located in this District.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants have and continue to market, sell, and/or otherwise disseminate Viptera and Duracade corn in this District, and because Defendants are actively doing business in this District.

22.     Venue is further proper because a substantial part of the property, particularly the farming operations and the farmland that is the subject of and forms the basis of this action, is situated in this District, and a substantial part of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### A.     The United States Corn Market

23.     The United States accounts for nearly 41% of global corn production. Corn is the largest crop grown in the U.S. in terms of both volume and value.

24.     Corn grown for grain purposes accounts for almost one-quarter of the harvested crop acres in the United States. This, according to the National Corn Growers'

Association, accounts for more than 85 million harvested acres in 2012. The United States is ranked first in the world for corn production.

25.     Corn is grown on more than 400,000 farms in the United States. The upper Midwest region of the U.S. provides an ideal combination of temperature, rainfall, and soil type for the cultivation of corn. The leading corn producing states are Illinois, Iowa, Minnesota, and Nebraska, which together accounted for more than half of the U.S.'s corn production in 2012. These states combined with Indiana, Ohio, Wisconsin, Missouri, Kansas, and South Dakota, account for 77% of the total annual U.S. corn production.

26.     There are several types of corn grown in the U.S., with the major types including field corn, sweet corn, and popcorn.  All are of the species *Zea mays*, and can cross pollinate. Field corn (also known as dent corn or simply, corn) occupies the majority of the corn acres in the United States.

27.     The U.S. corn marketing system is predominantly commodity-based. Corn from thousands of farmers is gathered, commingled, and shipped through local, regional, and terminal grain elevators. These elevators, and other corn storage and transportation facilities, are generally not equipped to test and segregate differing corn varieties due to the costs associated with such a time-consuming process.

### B.     Corn Cultivation and Exports

28.     *Zea mays L. subsp. mays*, known as maize throughout the world, and as corn in the United States, is a member of the Maydeae tribe of the grass family, Poaceae. It is an annual plant with separate male and female flowers on each plant (monoecious) that requires human intervention for its seed dispersal and propagation.

29.     Corn is predominantly a wind-pollinated outcrossing species. Transgenes in crops have the potential to move between sexually compatible populations, and more so in corn being a wind-pollinated plant with separate male and female flower bearing structures (inflorescences).

30.     Corn is grown for animal feed, human food, vegetable oil, high fructose corn syrups, starch, fermentation into ethanol, and a multitude of industrial uses.

31.     The United States exports about 20% of its domestic corn production to other countries. In 2012, China was the third-leading market for the export of U.S. corn, trailing Japan and Mexico, with 203 million bushels of U.S. corn exported. The U.S. is by far the world's largest exporter of corn, accounting for approximately 68% of global exports.

**C.     Syngenta's Development of Viptera Corn**

32.     Syngenta developed MIR162 in order to make corn that is resistant to the feeding damage caused by corn earworm (*Helicoverpa zea*), fall armyworm (*Spodoptera frugiperda*), black cutworm (*Agrotis ipsilon*), and western bean cutworm (*Striacosta albicosta*) larvae.

33.     This insect resistance in MIR162 comes from a bacterial gene called Vip3Aa20 (Vip is short for "Vegetative insecticidal protein"). The MIR162 corn also contains manA gene from *E. coli* encoding the enzyme phosphomannose isomerase ("PMI"), which was used as a selectable marker during transformant selection. The manA gene expression confers no other benefit to the regenerated transformed corn plant.

34.     The family of Vip3Aa proteins, in which Vip3Aa20 belongs, are produced by the bacterium *Bacillus thuringiensis* ("*Bt*") that act as toxins to kill insects. Within the corn-biotechnology industry, corn which is manipulated in this fashion is commonly referred to as "*Btcorn*."

35.     Viptera's insecticidal protection comes from the Vip3A protein, which binds to the insect and forms pores, killing the insect before further crop damage occurs. The specific genetic material inserted into the genome of Viptera corn allows the genetically modified corn to produce certain proteins, including CrylAb, mCry3A, and Vip3A. These proteins have insecticidal properties which, according to Syngenta, can control "more insects than any other trait stack on the market."

36.     Syngenta invested approximately $200 million and spent five to seven years developing Viptera corn.

37.     As a bio-engineered product, Viptera corn was subject to U.S. regulatory approval prior to cultivation and sale. In April 2010, Syngenta announced it had received deregulation from the USDA for the Agrisure Viptera trait. Syngenta's press release stated that the Viptera trait "has demonstrated unsurpassed multi-pest control of 14 yield- and quality-robbing insects."

38.     Following its approval in spring 2010, Syngenta made the decision to release Viptera corn commercially for the 2011 growing season through product names such as Agrisure Viptera 3110 & 3111. This was sold through its seed partners Golden Harvest®, Garst®, NK®, and additional independent retailers. Although the U.S. Department of Agriculture had deregulated the trait, Syngenta released Viptera corn into

the market even though it lacked regulatory approval from certain key import markets such as China, Japan, and the European Union.

39.     While Japan and the European Union have since approved the Viptera corn trait for import, China's regulatory authorities have not granted approval; despite Syngenta's repeated assurances to the contrary that approval was forthcoming. Even with China's approval stalled, Syngenta still encourages farmers to grow Viptera and Duracade corn, while downplaying and misrepresenting the risks of the foreclosure of the Chinese market, through the advertisements and public statements described herein.

40.     Viptera corn is protected by Syngenta patents, giving Syngenta the right to exclude others from selling products with the Viptera corn traits. Syngenta thus is motivated to maximize its period of exclusivity when no other seller can sell Viptera. Syngenta has pushed its product on farmers, prior to import approval from China, to enhance its profit margin before other competitors could sell the product.

41.     In September 2014, Syngenta announced 52 new corn hybrids for the 2015 growing season in the United States. The Agrisure Viptera trait is featured in 23 of the new hybrids, and the Agrisure Duracade trait is incorporated into 18 of the new hybrids. Syngenta has promoted these hybrids by representing that they "protect corn crops" and offer "the latest corn rootworm technology." Syngenta has continued to market these hybrids to farmers even without Chinese approval.[1]

---

[1] *See Syngenta Announces 52 New Corn Hybrids for 2015 Season*, AGPROFESSIONAL, http://www.agprofessional.com/news/Syngenta-announces-52-new-corn-hybrids-for-2015-season-275494841.html (Sept. 17, 2014).

42.     China, having not approved the importation of Viptera corn, maintains a zero tolerance policy regarding contamination of corn imports with corn containing MIR162. This means that any detection of MIR162 in a shipment to China could result in the rejection of the entire shipment. Syngenta had knowledge of China's zero-tolerance policy prior to the commercialization and release of Viptera corn.

### D.     Contamination of the United States Corn Supply

43.     After Viptera received U.S. regulatory approval, Syngenta offered farmers a "side-by-side program" which encouraged farmers to plant Viptera corn adjacent to other corn seed.

44.     Syngenta encouraged this side-by-side planting process despite the known contamination risks in doing so. Syngenta knew that commingling different varieties of corn is a risk during the planting, harvesting, drying, storage, and transportation process. Once released, a corn variety will, without adequate precautions, contaminate the broader corn supply.

45.     By promoting the side-by-side program, Syngenta helped spread the amount of MIR162 that would appear in the U.S. corn supply, thus putting exports to countries that had not approved the trait (such as China) at risk.

46.     Syngenta also knew, or should have known, that commingling would result in Chinese regulatory officials rejecting shipments of U.S. corn.

47.     Moreover, corn replicates by cross-pollination from one plant to another. Pollen from corn has been demonstrated to drift over considerable distances and cross-

breed with corn from other plants. The corn resulting from this cross-pollination can express traits from the pollen-donating plant.

48.     At a minimum, this pollen can travel 200 feet. Some studies have found that cross-pollination cannot be eliminated, even at a distance of one-third of a mile.[2]

49.     Studies have found that "even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination through cross pollination."[3] Thus, without adequate precautions, neighboring corn fields will exchange pollen.

50.     As a leader in the field of corn biotechnology, Syngenta understood the effects of contamination by cross-pollination at the time it chose to release Viptera corn.

51.     In its "Agrisure Traits Stewardship Guide," Syngenta recognized that crosspollination is a "normal occurrence in corn production" and that achieving 100% of purity of seed or grain is impossible in any corn production system.

52.     Notably, this is not the first time biotechnology companies have had problems with export markets rejecting genetically engineered corn. In September 2000, it was reported that some taco shells sold in retail stores contained a protein from Aventis's genetically engineered StarLink corn, which was approved only for feed and non-food industrial uses but not for human consumption.

---

[2] *See* Peter Thomison, *Managing "Pollen Drift" to Minimize Contamination of Non-GMO Corn, AGF-153*, OHIO STATE UNIVERSITY EXTENSION, http://ohioline.osu.edu/agf-fact/0153.html (last visited October 14, 2014).
[3] *Id.*

53.     This discovery led to the recall of numerous food products and a corn buyback program. Due to foreclosure of corn export markets, the StarLink recall also depressed domestic corn prices.

54.     In 2003, farmers who did not plant StarLink and who had suffered economic losses due to depressed corn prices following the StarLink recall settled a class-action lawsuit against Aventis for over $100 million.

### E.     Grain Elevators Refuse Viptera Corn

55.     After the 2011 planting season, Bunge North America, Inc., a grain elevator and handler based in St. Louis, Missouri, posted signs and distributed materials stating that Viptera corn would not be accepted during the 2011 harvest season.

56.     Bunge cited the lack of Chinese import approval as its reason for not accepting Viptera corn.

57.     In response, Syngenta sued Bunge in federal court, *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. C 11-4074-MWB (N.D. Iowa) (Bennett, J), seeking preliminary and permanent injunctions requiring Bunge to stop posting materials regarding its refusal to accept Viptera corn. The lawsuit also sought an injunction which would have required Bunge to accept Viptera corn at its facilities.

58.     Bunge replied to the lawsuit by stating that its decision not to accept Agrisure Viptera corn was consistent with the North American Export Grain Association's policy to advocate that technology providers receive all major international approvals for a trait prior to seed sales. Bunge stated that Syngenta had undertaken an action that could put at risk a major export market for U.S. corn (China).

59.     Syngenta's request for a preliminary injunction was denied, several of Syngenta's claims were dismissed on the pleadings while others were voluntarily dismissed, and on appeal, dismissal was affirmed in part, with Syngenta's action remanded to determine whether Syngenta had standing under the zone-of-interests test and proximate causality requirement for asserting a Lanham Act claim related to Bunge's posting of its policy to reject Viptera corn at its elevators. The remanded action remains pending.

60.     Major grain handlers, such as Bunge, Archer Daniels Midland, Cargill, and others still refuse to accept Viptera corn, because preventing commingling is essentially impossible.   Indeed, major grain handlers have reported that Syngenta's actions are inconsistent with industry standards and the conduct of other biotechnology seed companies.

## F.     China Rejects United States Corn Shipments

61.     China was the seventh largest corn import market for the 2009-2010 crop year with widespread predictions that it would move into the top five by 2011-2012. By 2013, China had moved into the top three export markets for U.S. corn. However, corn trade between the United States and China declined drastically in January 2014 after the trade disruption resulting from detection of MIR162.

62.     On or about November 2013, Chinese regulatory officials began rejecting cargo shipments of U.S. corn after the shipments tested positive for the trace presence of Viptera corn.

63.     On December 24, 2013, the General Administration of Quality Supervision, Inspection and Quarantine of China issued a warning notification strengthening the inspection and supervision for the import of GMO feed materials. This notification stated the impetus was that Shanghai Chinese Inspection and Quarantine Service had detected MIR162. The notification stated that all batches of corn would now be tested at Chinese ports for MIR162, and that any cargo that tested positive would be returned or destroyed.

64.     After this notification, all U.S. corn exports were put at risk.

65.     The decision to test corn exports at Chinese ports caused some Chinese customers to refuse to honor their contracts to purchase corn, and it also injected a great deal of uncertainty into the market.

66.     Since November 2013, Chinese imports for U.S. corn have decreased by an estimated 85%, because each export contract is at risk. As a result, domestically, corn prices have fallen considerably downward.

67.     China strengthened its policy regarding MIR162 again in July 2014, after an increasing number of U.S. corn shipments began testing positive.

68.     This market shift comes as China was projected to import a record high 7,000,000 tons of U.S. corn in 2014, according to the U.S. Department of Agriculture.

69.     Syngenta knew, or should have known, that disruption to the Chinese import market would influence the global corn market, that contracts between grain exporters and Chinese corn buyers would be negatively affected if MIR162 was found in grain exports to China, and that U.S. farmers would suffer damages if these contracts

were placed at risk, in the form of a declining market and a lower sale price per bushel of corn.

### G.   Syngenta's Misrepresentations Regarding the Corn Export Market, Genetically Modified Corn, And the Status of Chinese Mir162 Approval

70.   Syngenta has repeatedly attempted to downplay and misrepresent the significance of the export market for corn on U.S. corn prices, China's key role in the U.S. export market, and the timing of Chinese approval of MIR162. Syngenta did this with the intention of encouraging farmers to continue to buy and plant its MIR162 corn.

71.   For example, Syngenta published a "fact sheet" on its website about Viptera called "Plant with Confidence," which is directed at farmers. Syngenta's fact sheet engages in direct misrepresentations about U.S. corn exports.

72.   In order to convince farmers that the loss of key export markets was unimportant, Syngenta's "Plant With Confidence" marketing materials states that "in the last five years, on average, only about 13% of U.S. corn has been exported." Additionally, Syngenta claims that "the vast majority of corn produced in the U.S. is used domestically."[4]

73.   The USDA Economic Research Service, however, has reported that approximately 20% of U.S. corn is exported to other countries and touts the U. S. as "a major player in the world corn trade market."[5]

---

[4] *See Plant With Confidence*, SYNGENTA, http://www.syngentaus.com/viptera_exports/ images/Agrisure-Viptera-Fact-Sheet.pdf (last visited October 14, 2014).
[5] *See Background*, U.S. DEPT. AGRICULTURE, http://www.ers.usda.gov/topics/crops/corn/ background.aspx#.VCGNPfldU2s (last updated July 15, 2014).

74.     Furthermore, Syngenta's "Plant With Confidence" fact sheet attempts to downplay the importance of China as an export market for U.S. corn. The fact sheet states that China has imported, on average, a little more than half of one percent (0.5%) of all U.S. corn produced in the past five years. Syngenta's fact sheet also states that "traditional major markets are legally able to accept Agrisure Viptera grain," which implies that China is not a traditional major market.

75.     Syngenta's misrepresentations contradict the statistics reported by the USDA, which state that China serves as the third-largest export market for U.S. corn. Moreover, while historically (prior to 2008) China was not a significant importer of U.S. corn, Syngenta knew that by 2010, China was projected to be a top-five importer of U.S. corn.

76.     In another documents entitled "Agrisure Viptera & China Import Approval FAQs" dated January 2014, Syngenta makes additional misrepresentations about China's lack of approval of Viptera suggesting that China was avoiding approval of Viptera as a pretext to encourage consumption of domestic Chinese corn.[6]

77.     Further despite acknowledging that the *earliest* China might approve Agrisure Duracade corn would be March 2015, Syngenta stated that it intends to proceed with commercializing and selling this corn.[7]

---

[6] *See 2015 Right to Grow Program Q&A*, SYNGENTA, http://www.syngenta-us.com/viptera_exports/images/Right_to_Grow_QA.pdf (last visited October 14, 2014).
[7] *Id.*

78.     Syngenta also knew the significant damage that U.S. farmers would experience as a result of the rejection of corn by China, yet continued to downplay and misrepresent the importance of this lost market.

79.     For example, in the lawsuit that Syngenta brought against Bunge, unrebutted evidence indicated that redirection costs for a rejected shipment of corn contaminated with the MIR162 trait could cost between $4 million to $20 million for a single shipment.[8]

80.     In Syngenta's 2010 Full Year Results, CEO Michael Mack acknowledged that Chinese "import requirements alone influence global commodity prices."

81.     In Syngenta's 2011 Half Year Earnings Report, Mr. Mack remarked on the importance of the Chinese market, stating that China "continues to have the greatest impact on world markets, with increasing imports not just of soybeans but also now of corn." This is contrast to what Syngenta was telling farmers (and continues to do so).

82.     Syngenta also repeatedly suggests that approval of MIR162 would happen imminently.

83.     For example, in response to a question during the 2012 first quarter earnings conference call regarding the status of Chinese approval of Viptera, Mr. Mack stated: "[t]here isn't outstanding approval for China, which we expect to have quite frankly within the matter of a couple days . . . we know of no issue with that whatsoever . . ."

---

[8] *See Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Sept. 26, 2011) ECF No. 42, at 12.

84.     Mr. Mack's statement was publicized sufficiently to constitute promotion within the grain industry. This statement dangerously impacted the corn market by encouraging (1) farmers to plant MIR162 without worrying about their ability to sell the corn to grain elevators, (2) grain elevators to accept and commingle MIR162 with other grains, and (3) exporters to purchase and ship products containing MIR162 without concerns that the shipments would be rejected in China.

85.     Similarly, in the *Bunge* proceedings, Syngenta told the Court that it anticipated receiving approval for MIR162 in China by March 2012.

86.     By 2014, Syngenta knew, or should have known, that China was no closer to approving MIR162, especially as the timing grew closer to the 2014 planting season. Mr. Mack stated during a conference call that "I think it is fair to say at this point in time that we don't have – that we will not have any approval before the start of the season. That's for sure." But what Syngenta told to outside investors, it failed to disclose to farmers.

87.     During Syngenta's second quarter 2014 earnings conference call, Mr. Mack stated that the delay of approval from Chinese authorities "is a regulatory matter in China as opposed to any regulatory matter with Syngenta. The delays coming out of China are such that people just aren't really understanding right now even what the process is."

88.     This statement, and others, underscored the fact that Syngenta recognized that they were no closer to gaining import approval from China. Still, Syngenta continues to sell MIR162 products, as well as launch new genetically-modified products, none of which have been approved by China – and continues to downplay the importance of the

Chinese export market. In continuing with this conduct, Syngenta knows, or should know, that it will continue to negatively impact the U.S. market for corn exports to China.

89.     Despite these statements in 2014, expressing uncertainty to as when China would grant approval, Syngenta also misled and continues to mislead exporters into believing that products containing MIR162 will be accepted in China.

90.     For example, on its website, Syngenta offers information about the status of Chinese import approval. The website states that Syngenta is attempting to "expedite import approval of MIR162" and that Syngenta's Duracade technology is "under active review." Notably, the "China Grain Import Situation" website fails to acknowledge that shipments of U.S. corn to China have been halted due to fears of contamination with MIR162.[9]

91.     On its website, Syngenta continues to offer a form entitled: "Request Form for Biosafety Certificates Issued by Chinese Ministry of Agriculture" (the "Form").[10] The Form states that the certificates for the following transgenic events were issued to Syngenta Seeds by the Ministry of Agriculture, and one of the transgenic events identified on the form is MIR162.

_____

[9] *See China Grain Import Situation*, SYNGENTA, http://www.syngenta-us.com/viptera_exports/ (last visited October 14, 2014).
[10] *Request Form for Biosafety Certificates Issued by Chinese Ministry of Agriculture*, SYNGENTA, http://www3.syngenta.com/country/us/en/agriculture/Stewardship/Documents/BiosafetyCertificate_RequestForm.pdf (last visited October 14, 2014).

92.     Moreover, the Form states that "The Biosafety Certificate(s) provided allows importation of the above marked corn products as raw materials for processing for food and feed use only, not for any research purpose or cultivation purpose."[11]

93.     The Form and corresponding language appear to emphasize that if an exporter completes the form, Syngenta will then issue a Biosafety Certificate, which will allow the cargo to enter China. This despite the fact that any products with MIR162 would be rejected by China irrespective of whether the Form was completed.

94.     Syngenta's Form was released as an advertisement for Viptera corn, as it indicates that products containing MIR162 may be imported into China if the form is correctly filled out.

95.     Syngenta included MIR162 on the Form, even though Syngenta knew that MIR162 was not approved for import into China, based on economic motivations, including the continued sales of Viptera corn.

96.     Syngenta's Form was disseminated sufficiently to constitute promotion within the seed sales industry.

97.     The statements made by Syngenta officials, including by Mr. Mack, as described above, illustrate that Syngenta knew that MIR162 had not been approved for import into China, even though other corn products/transgenic events identified on the Form had been approved.

---

[11] *Id.*

98.     More than two years have passed since the earnings conference call where Syngenta's CEO expressed that approval was days away, and yet, MIR162 still has not been approved in China.

**H.     The Impact of Syngenta's Conduct**

99.     In a question about whether Syngenta would insure farmers from losses caused by Viptera rejection in China during a 2014 first quarter conference call, Mr. Mack replied: "[F]armers don't have any exposure whatsoever to Chinese corn rejection. When they sell their corn into an elevator, the elevator then sells it on to a grain trader where, if and where there is any financial exposure from a rejection, that's between the two parties, the importer and the exporter of corn. The farmers don't involve themselves in that. So with respect to indemnifying a farmer, backstopping their losses, there's no need for Syngenta to do that because the farmer doesn't have any exposure to that."

100.    To the contrary, losses to United States corn farmers as a result of Syngenta's activities have been staggering.

101.    The National Grain and Feed Association (NGFA) found that Chinese rejection of U.S. corn, which resulted solely from concerns that MIR162 had infiltrated the entire U.S. corn supply, have lowered corn prices by eleven cents per bushel, leading to a projected loss of $1.14 billion for the last nine months of the marketing year ending on August 31, 2014.

102.    Overall, corn exports for the 2013/14 marketing year totaled 46,867,700 metric tons, which amounted to 4% less than the U.S. Department of Agriculture's

projection of 48,770,000 metric tons, according to USDA figures released in September 2014.

103.    The NGFA has called on Syngenta to stop selling the genetically modified corn varieties until the varieties can be sold in major export markets, such as China.

104.    In a joint statement with the North American Export Grain Association (NAEGA), NGFA also requested that Syngenta stop the release of Duracade corn, stating: "NAEGA and NGFA are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural procedures – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage."

105.    Instead of agreeing to this request, Syngenta is proceeding with plans to expand upon its limited release of Duracade – a new type of genetically modified corn, which also is not yet approved in China. One NGFA official stated that this new gene is also likely to show up in exports, further exacerbating problems with China and other nations that have not granted approval, but that Syngenta remains motivated by its profit margin. "They're being a bad actor here," Max Fischer of NGFA said, referring to

Syngenta. "They're making $40 million" selling the new corn varieties, "but it's costing U.S. farmers $1 billion."[12]

106.    Upon information and belief, Viptera corn accounts for approximately 25% of Syngenta's corn portfolio. In 2013, Syngenta's corn sales totaled more than $3.5 billion.

107.    In addition to falling prices for corn, Plaintiffs and other Class members have been damaged in other ways as a result of Syngenta's reckless decision to sell and distribute genetically modified corn seeds without receiving import approval from China. As further detailed herein, U.S. grain companies cannot put themselves at risk of having an unmarketable product when their blended corn arrives at export terminals. Thus, U.S. grain companies are asking farmers to ensure that Viptera and Duracade corn traits are completely removed from their deliveries.

108.    Farmers must segregate different types of corn on their farms until the regulatory concerns are resolved. The National Corn Growers Association has urged farmers to "double recheck any seed plots" on farms or contract with a third party to verify that corn with unapproved traits, such as MIR162, have not infiltrated the overall export supply.[13]

---

[12] *See* Dan Charles, THE SALT, *When China Spurns GMO Imports, American Farmers Lose Billions*, http://www.npr.org/blogs/thesalt/2014/07/31/336833095/when-china-spurns-gmocorn-imports-american-farmers-lose-billions (July 31, 2014 5:45 PM).
[13] NCGA Online Campaign Highlights the Importance of Proper Grain Channeling, NATIONAL CORN GROWERS ASSOCIATION, http://www.ncga.com/news-and-resources/news-stories/article/2014/09/ncga-online-campaign-highlights-the-importance-of-proper-grain-channeling (September 23, 2014).

109.   No matter how careful farmers are in separating their grain, such contamination still can happen in multiple ways, including accidental mixing and cross-pollination by bees or wind. Farmers are being instructed to thoroughly clean out their grain legs, augers, grain carts, and any other equipment that is used to harvest corn containing the Viptera and Duracade traits.

110.   Syngenta knew, or should have known, before it disseminated corn with the MIR162 genetic trait, that such cross-pollination could not be prevented despite farmers' best efforts. Syngenta knew, or should have known, that the U.S. corn production and marketing chain is a commodity-based system that gathers, commingles, and ships corn from thousands of farms, and that widespread commingling of genetically modified corn with non-genetically modified corn could not be completely prevented.

## CLASS ACTION ALLEGATIONS

111.   Pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure Plaintiffs bring this action on behalf of themselves and as the "Class" defined as:

**Nationwide Class**
All persons and entities in the United States, who since November 1, 2013 grew, harvested and sold non-MIR162 corn on a commercial basis (including those who received revenue from or such corn under a crop-share agreement).

**Wisconsin Subclass**
All persons and entities in Wisconsin, who since November 1, 2013 grew, harvested and sold non-MIR162 corn on a commercial basis (including those who received revenue from or such corn under a crop-share agreement).

Specifically excluded from the Class and Subclass are: (a) any officers, directors or employees of Defendants; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to

hear this case.  The Class and Subclass are collectively referred to herein as the "Class" unless otherwise indicated.

112.    All requirements for class certification in Fed. R. Civ. P. 23(a), and 23(b)(3) are satisfied with respect to the Class.   Alternatively, class certification under Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) is proper.

113.    ***Numerosity of the Class.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  The precise number of members of the Class and their addresses are presently unknown to Plaintiffs.  Plaintiffs are informed and believe that there are thousands of putative class members nationwide, and certainly more than 40.  Therefore, the numerosity requirement of Rule 23(a)(1) is met.

114.    ***Ascertainable Class.***  The community of interest among these class members in the litigation is well defined and the proposed classes are ascertainable from objective criteria.  If necessary to preserve the case as a class action, the court itself can redefine the Class and/or create sub-classes.

115.    ***Common Questions of Fact and Law Exist and Predominate over Individual Issues.***  There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented.  These common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members of the Class.  Defendants have engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Class. Similar or identical statutory and common law violations, business practices, and injuries are involved as to all members in the Class and each State

Sub-Class. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.  These common legal and factual questions include without limitation:

      a.      whether Syngenta through its conduct, acts and omissions caused or allowed MIR162 to contaminate and comingle the U.S. corn and corn seed supplied;

      b.      whether Defendants caused or allowed MIR162 to contaminate the U.S. corn and corn seed supplies;

      c.      whether Defendants caused or allowed MIR162 to contaminate the U.S. Dried Distillers Grains with Solubles supply;

      d.      whether U.S. corn prices have dropped due to Defendants' conduct;

      e.      whether Plaintiffs and the members of the proposed class have sustained or continue to sustain damages as a result of Syngenta's wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining damages for the injuries sustained;

      f.      the proper measure of damages; and

      g.      whether Plaintiffs and other class members are entitled to injunctive, declaratory or other equitable relief.

116.  ***Typicality.***  Plaintiffs are members of and present claims that are typical of the claims of members of the Class.  Plaintiffs' claims are typical because the claims arise from the same course of conduct by Syngenta and are based upon the same legal theories. Plaintiffs and all Class members each sustained damages arising from Defendants' wrongful

conduct, as alleged more fully herein.  All members of the Class have been the subject of

Defendants' unfair and unlawful business practices as described herein.  The relief sought is

common, unitary, and class-wide in nature.  The farmers in the Class have lost income and

sustained other economic loss as a result of the loss of the China market and depression of

prices.  The same material facts that Defendants withheld from Plaintiffs were withheld from

the other members of the Class.  The test for materiality is an objective test subject to class

wide proof.

117.  **Adequacy of Representation.**  Plaintiffs will fairly and adequately represent

and protect the interest of the members of the Class.  Plaintiffs share a common interest with

all Plaintiff class members, with respect to the conduct of Defendants herein, and redress of

same.  Plaintiffs have suffered an injury-in-fact as a result of the conduct of Defendants, as

alleged herein.  Plaintiffs have retained counsel who is competent and experienced in the

prosecution of complex litigation and class actions.  Plaintiffs and their undersigned counsel

intend to prosecute this action vigorously and faithfully for the benefit of the Class.  Plaintiffs

have no interests contrary to the class members, and will fairly and adequately protect the

interests of the Class.  Plaintiffs' counsel, identified below, satisfies the requirements of Fed.

R. Civ. P. 23(g) to serve as class counsel.   Plaintiffs satisfy the adequacy of representation

requirement in Fed. R. Civ. P. 23(a)(4)

118.  ***Predominance/Community of Interest***.  The proposed Class has a well-defined

community of interest in the questions of fact and law to be litigated.  The common questions

of law and fact are predominate with respect to the liability issues, relief issues and

anticipated affirmative defenses. The named Plaintiffs have claims typical of the Class.

Without limitation, as a result of Defendants' conduct alleged herein, Plaintiffs were: (a) injured; and (b); sustained pecuniary loss in an ascertainable amount to be proven at the time of trial.

119.    **Superiority of Class Adjudication.** The certification of a class in this action is superior to the litigation of a multitude of cases by members of the putative class.  Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendants and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the class members in relationship to the benefits received.  Even if the members of the classes themselves could afford individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

120.    In the alternative, the above-defined Class may be certified pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(2) because:

a.    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to

individual class members' claims which would establish incompatible

standards of conduct for Defendant;

b.    The prosecution of separate actions by individual members of the classes

would create a risk of adjudications which would as a practical matter be

dispositive of the interests of other members of the classes who are not

parties to the adjudications, or which would substantially impair or impede

the ability of other class members to protect their interests; and,

c.    Defendants have acted or refused to act on grounds generally applicable to

the classes, thereby making appropriate final and injunctive relief with

respect to the Class.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF LANHAM ACT - 15 U.S.C. §1125(a)(l)(B)

121.    Plaintiffs incorporate by reference all of the above-stated paragraphs as though

fully set forth herein.

122.    The Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part:

> (1) Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any
> word, term, name, symbol, or device, or any combination
> thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact,
> which-

> (B) in commercial advertising or promotion, misrepresents the
> nature, characteristics, qualities, or geographic origin of his or
> her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that
> he or she is or is likely to be damaged by such act.

123.    Syngenta used and/or continues to use in commerce false or misleading descriptions of fact and/or false or misleading representation of fact, which were likely to cause and/or did cause confusion or mistake.

124.    Syngenta's statements and commentary made to the press, on the Internet, during quarterly conference calls, and incorporated into Syngenta's forms, which, inter alia, represent Viptera corn is or would imminently be approved for import into China, as alleged above, are materially false or misleading statements that are and continue to be likely to cause confusion and mistake as to the nature, characteristics, and qualities of Viptera corn.

125.    Syngenta's misleading representations of fact relating to the U.S. corn export market, and particularly in relation to China's position as a major export market, also deceived and/or continue to deceive farmers and other consumers. Syngenta's "Plant With Confidence" fact sheet has, and is likely to continue, to cause confusion and mistake as to the percentage of U.S. corn exported to China on an annual basis, among other facts.

126.    Additionally, Syngenta's representations deceived and/or continue to deceive farmers and other consumers as to the approval of their goods (namely Viptera and Duracade corn).

127.    Syngenta's Viptera and Duracade corn products caused, and/or were likely to cause, customer confusion regarding the approval of the products from foreign regulatory authorities, including the Chinese government.

128.    Yet, Syngenta has used and/or continues to use false representations regarding the approval of Viptera and Duracade corn to capture business, increase sales, and enhance products.

129.    Syngenta's statements were made as an advertisement for Viptera corn.

130.    Syngenta's statements refer specifically to Viptera corn.

131.    Syngenta had an economic motivation for making its statements—sales of Viptera corn.

132.    Syngenta's statements were likely to influence purchasing decisions.

133.    Syngenta's statements where widely distributed, which is, at least, sufficient to constitute promotion within the grain industry.

134.    Upon information and belief, Syngenta's misleading representations and omissions are/or were material.  Plaintiffs and the farming community have relied on Syngenta's material misrepresentations or omissions.

135.    Plaintiffs  have been and continue to be damaged by Syngenta's conduct.

136.    Plaintiffs' damages were proximately caused by Syngenta's acts.

137.    At least, Syngenta has indicated Chinese approval was imminent, when in fact it was not, and the Form falsely represents that Viptera corn was approved for import into China.

138.    Syngenta's acts constitute the use of false descriptions and false representations in interstate commerce in violation of  the Lanham Act, 15 U.S.C. §1125(a).

139.    As a direct and proximate result of the foregoing, Plaintiffs and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## COUNT II
## PUBLIC NUISANCE

140.    Plaintiffs incorporate by reference all of the above-stated paragraphs as though fully set forth herein.

141.    Through the conduct alleged above, Syngenta has created a public nuisance by causing widespread contamination of the U.S. corn supply with the MIR162 trait.

142.    This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities. It arises from Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn: (a) without adequate precautions to prevent contamination of the U.S. corn and corn seed supplies; (b) with the knowledge that Viptera corn would contaminate other corn; (c) with the knowledge that this contamination would likely affect the U.S. corn and corn seed supplies; or, (d) with the knowledge that there was a substantial risk of contamination of corn and corn seed supplies earmarked for export.

143.    Syngenta has unreasonably interfered with the public's right to expect compliance with the federal laws governing the testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn. Syngenta has further unreasonably interfered with the public's right to expect that the corn sold to the general public is free from contamination with Viptera corn as well as the public's right to be

notified of whether the corn sold to the public is contaminated with genetically-modified organisms, including corn containing MIR162, so that the public has the freedom to choose to purchase and consume non-contaminated corn.

144.     This interference is unreasonable in that it involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience. It is also unreasonable in that it is proscribed by law, is of a continuing nature, and has produced a permanent or long-lasting effect.

145.     Plaintiffs have suffered harm caused by Syngenta's public nuisance distinct from and different than that suffered by the general public, as described above. Plaintiffs and the Class's damages include, but are not limited to, the elimination of their ability to sell their corn for export to the Chinese market; depressed prices for the sale of their corn; commingling of MIR162-corn with their non-MIR162 corn at grain elevators, terminals, rail cars, barges and ships; almost-certain contamination of the MIR162 genetic trait with their non- MIR162 corn as a result of cross-pollination from nearby fields; and increased cleaning costs of their farm equipment in an attempt to reduce MIR162 contamination.

146.     This constitutes an unreasonable and substantial interference with rights common to the general public, restricted demand for their products and services in certain markets; and reduced prices for their corn in all markets.

147.     In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries and damages to Plaintiff. Nevertheless, Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

148.    As a direct and proximate result of the foregoing, Plaintiffs and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## COUNT III
## TRESPASS TO CHATTELS

149.    Plaintiffs incorporate by reference all of the above-stated paragraphs as though fully set forth herein.

150.    Plaintiffs and those similarly situated commonly enter into contracts for the purchase of corn well in advance of delivery.

151.    Syngenta, by testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn has contaminated the U.S. corn supply as described above.

152.    MIR162 contamination has negatively impaired the condition, quality, or value of the U.S. corn supply.

153.    Plaintiffs, as a direct and proximate result of the fault of Syngenta, have been damaged in amounts not fully determined but far in excess of any jurisdictional requirements of this court for diversity jurisdiction.

154.    Plaintiffs' and the Class's damages include, but are not limited to, the elimination of their ability to sell their corn for export to the Chinese market; depressed prices for the sale of their corn; commingling of MIR162-corn with their non-MIR162 corn at grain elevators, terminals, rail cars, barges and ships; almost-certain contamination of the MIR162 genetic trait with their non- MIR162 corn as a result of cross-pollination from

nearby fields; and increased cleaning costs of their farm equipment in an attempt to reduce MIR162 contamination.

155.    Syngenta's actions, including the testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn, which led to the market-wide contamination have harmed Plaintiffs' economic interests.

156.    As a direct and proximate result of the foregoing, Plaintiffs and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## COUNT IV
## COMMON LAW NEGLIGENCE

157.    Plaintiffs incorporate by reference all of the above-stated paragraphs as though fully set forth herein.

158.    With respect to its testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn, Syngenta had a duty to utilize its professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Syngenta's business.

159.    Syngenta breached this duty by failing to exercise the requisite degree of care in testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn to prevent it from contaminating the U.S. corn supply.

160.    Upon information and belief, Syngenta further breached their duty by failing to notify the appropriate regulatory bodies and the public in a timely fashion after it first learned of the contamination of the U.S. corn supply with MIR162.

161.    The damages incurred by Plaintiffs were or should have been foreseen by Syngenta as Syngenta understood the risks of releasing Viptera corn.

162.    Plaintiff and the Class's damages include, but are not limited to, the elimination of their ability to sell their corn for export to the Chinese market; depressed prices for the sale of their corn; commingling of MIR162-corn with their non-MIR162 corn at grain elevators, terminals, rail cars, barges and ships; almost-certain contamination of the MIR162 genetic trait with their non- MIR162 corn as a result of cross-pollination from nearby fields; and increased cleaning costs of their farm equipment in an attempt to reduce MIR162 contamination.

163.    Syngenta breached its duties, as alleged above, breached the requisite standard of care owed to Plaintiffs and those similarly situated, and was therefore negligent.

164.    Syngenta's breaches are a direct and proximate cause of the injuries and damages sustained by Plaintiffs in amounts not yet fully determined but far in excess of any amounts necessary for diversity jurisdiction.

165.    As a direct and proximate result of the foregoing, Plaintiffs and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## COUNT V
## STRICT LIABILITY-PRODUCTS LIABILITY

166.    Plaintiffs incorporate by reference all of the above-stated paragraphs as though fully set forth herein.

167.    Syngenta was and continues to be a supplier of Viptera corn.

168.    Syngenta has in the past and continues to manufacture, sell, or otherwise distribute Viptera corn.

169.    Viptera corn was used in a manner reasonably anticipated.

170.    As a direct and proximate result of the defective and unreasonably dangerous condition of Viptera corn as it existed when Syngenta supplied it, Plaintiffs have sustained injuries and damages as alleged above.

171.    In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries and damages to Plaintiff, yet continued such conduct in reckless disregard for the consequences.

172.    Plaintiffs' and the Class's damages include, but are not limited to, the elimination of their ability to sell their corn for export to the Chinese market; depressed prices for the sale of their corn; commingling of MIR162-corn with their non-MIR162 corn at grain elevators, terminals, rail cars, barges and ships; almost-certain contamination of the MIR162 genetic trait with their non- MIR162 corn as a result of cross-pollination from nearby fields; and increased cleaning costs of their farm equipment in an attempt to reduce MIR162 contamination.

173.    Syngenta's Viptera corn is the direct and proximate cause of the injuries and damages sustained by Plaintiff.

174.    As a direct and proximate result of the foregoing, Plaintiffs and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## COUNT VI
## STRICT LIABILITY- FAILURE TO WARN

175.    Plaintiffs incorporate by reference all of the above-stated paragraphs as though fully set forth herein.

176.    Syngenta is strictly liable to Plaintiffs resulting from its failure to warn about the dangers of planting, growing, harvesting, transporting, or otherwise utilizing Viptera corn.

177.    Syngenta sold Viptera corn in the course of its business, as alleged above.

178.    When planted, grown, harvested, transported or otherwise utilized as reasonably anticipated and without knowledge of its characteristics, Viptera corn was unreasonably dangerous at the time of its sale.

179.    Syngenta did not give an adequate warning of the danger of planting, growing, harvesting, transporting, or otherwise utilizing Viptera corn.

180.    Upon information and belief, Viptera corn was used in a reasonably anticipated manner.

181.    Plaintiffs suffered injury and damages as a direct and proximate result of Syngenta's failure to provide an adequate warning regarding the dangers of planting, growing, harvesting, transporting, or otherwise utilizing Viptera corn at the time Viptera corn was sold.

182.    Plaintiffs and the Class's damages include, but are not limited to, the elimination of their ability to sell their corn for export to the Chinese market; depressed prices for the sale of their corn; commingling of MIR162-corn with their non-MIR162 corn

at grain elevators, terminals, rail cars, barges and ships; almost-certain contamination of the

MIR162 genetic trait with their non- MIR162 corn as a result of cross-pollination from

nearby fields; and increased cleaning costs of their farm equipment in an attempt to reduce

MIR162 contamination.

183.    In light of the surrounding circumstances, Syngenta knew or should have

known that their conduct would naturally or probably result in injuries to Plaintiffs and class

members.

184.    Nevertheless, Syngenta continued such conduct in reckless disregard of or

conscious indifference to those consequences.

185.    As a direct and proximate result of the foregoing, Plaintiffs and the Class have

been injured and suffered financial loss for which damages, injunctive, declaratory and

other relief as may be available at law or equity is warranted.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

186.    Plaintiffs incorporate by reference all of the above-stated paragraphs as though

fully set forth herein.

187.    Plaintiffs have a business relationship with various grain elevators, co-ops, and

supply companies whereby Plaintiffs would sell their corn to such companies. This business

relationship was memorialized by invoices, receipts, and other documents showing a

consistent course of sales.

188.    Plaintiffs have a reasonable expectation of economic gain resulting from the

relationship with these grain elevators and supply companies, and Plaintiff reasonably

expected to continue to sell corn from their farm to such companies. Thus, Plaintiffs

rightfully maintained the expectation that such business relationships would continue in the

future.

189.    Syngenta knew that Plaintiffs and other farmers in the Class had business

relationships with such grain elevators and supply companies in the normal chain of crop

export and sales, and Syngenta was fully aware that Plaintiffs and other farmers expected

these business relationships to continue in the future.

190.    Despite this knowledge, Syngenta made representations that deceived and/or

continue to deceive farmers and other consumers as to whether grain elevators and other

supply companies would accept Viptera and Duracade corn. These misrepresentations,

which included a "Plant With Confidence" fact sheet on Syngenta's website and other

various forms, stated that Viptera corn is or would imminently be approved for import into

China. As a result of these representations, Plaintiffs and other Class members reasonably

believed that growing Viptera and Duracade was commonplace and that their ability to sell

such corn would not be impacted.

191.    Syngenta interfered with these prospective future business relationships

through its conscious decision to bring Viptera and Duracade corn to the market. Syngenta

knew, or should have known, that the releasing MIR162 corn would lead to the

contamination of all U.S. corn shipments and prevent U.S. corn from being sold to export

markets such as China, which has not granted import approval.

192.    Syngenta's release of MIR162 corn has destroyed the export of U.S. corn to

China and caused depressed prices for all domestic corn producers.  Thus, Plaintiffs and

other Class Members are unable to sell their corn to grain elevators and supply companies at the price they reasonably expected to receive and would have received but for Syngenta's conduct.

193.    Syngenta intentionally interfered with Plaintiffs' prospective business relationships; and Syngenta knew the interference was certain or substantially certain to occur as a result of its conduct in releasing MIR162 corn into the U.S. market.

194.    Plaintiff s have been proximately damaged and continues to be damaged as a result of Syngenta's interference.

195.    Plaintiffs and the Class's damages include, but are not limited to, the elimination of their ability to sell their corn for export to the Chinese market; depressed prices for the sale of their corn; commingling of MIR162-corn with their non-MIR162 corn at grain elevators, terminals, rail cars, barges and ships; almost-certain contamination of the MIR162 genetic trait with their non- MIR162 corn as a result of cross-pollination from nearby fields; and increased cleaning costs of their farm equipment in an attempt to reduce MIR162 contamination.

196.    As a direct and proximate result of the foregoing, Plaintiffs and the Class have been injured and suffered financial loss for which damages, injunctive, declaratory and other relief as may be available at law or equity is warranted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray and respectfully request recovery from the Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, as follows:

A.     Entry of preliminary and permanent injunctions providing that Syngenta shall be enjoined from selling, marketing, distributing, or otherwise disseminating Viptera corn and Duracade corn, in addition to any other product featuring MIR162 until such time as MIR162 has been approved for import to China;

B.     Entry of judgment ordering Syngenta to take affirmative steps to remediate the contamination that it has already caused;

C.     Entry of judgment finding:

   i.     Syngenta falsely advertised Viptera corn under§ 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

   ii.     Syngenta's release of Viptera corn constitutes a public nuisance;

   iii.     Syngenta's release of Viptera corn and contamination of the U.S. corn supply constitutes a trespass to chattels;

   iv.     Syngenta's release of Viptera corn was negligent;

   v.     Syngenta is strictly liable for damages done by the release of Viptera corn;

   vi.     Syngenta tortiously interfered with Plaintiff's prospective business relations by releasing MIR162 corn into the U.S. market; and

D.     Monetary damages including compensatory relief to which Plaintiffs and the Class are entitled and will be entitled at the time of trial, but in an amount exceeding $75,000;

E.     Prejudgment interest;

F.     The costs of this action;

G.     Reasonable attorneys' fees and expenses; and

H.     All such other and further relief as may be available at law or equity and may

be proper in the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.


Dated: November 17, 2014                    **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**



By:  s/  Yvonne M. Flaherty
Yvonne M. Flaherty, 267600
100 Washington Avenue South, Suite 2200
Minneapolis MN 55401
Phone:  612-339-6900
Fax:     612-339-0981
ymflaherty@locklaw.com

Joseph M. Lyon, OH-076050
THE LYON FIRM
2021 Auburn Ave.
Cincinnati, Ohio 45219
Tel: (513) 381-2333
Fax: (513) 381-0394
jlyon@thelyonfirm.com

*ATTORNEYS FOR PLAINTIFF*